SMITH *et al. v.* FAIRCHILD *et al.*

(Division B. Oct. 19, 1942. Suggestion of Error Overruled Dec. 14, 1942.)

[10 So. (2d) 172. No. 35032.]

George W. Currie and Luther A. Smith, both of Hattiesburg, for appellants.

**E. J. Currie,** of Hattiesburg, for appellees.

Argued orally by **George W. Currie**, for appellants, and by **E. J. Currie**, for appellees.

**Roberds, J.**, delivered the opinion of the court.

This is an appeal from a decree of the chancery court dismissing the bill of appellants to enjoin the location and operation by appellees of an undertaking and embalming establishment near the southwest corner of the intersection of Main and Seventh Streets in the northern part of the City of Hattiesburg, Mississippi.

Fairchild and Richard, appellees, purchased a property which for many years had been, and was then being, used and occupied as a residence, paying therefor $3,650. Immediately on learning of this and of the intention of appellees to convert the property into a funeral home, twenty-three persons, all residents, and some owners of homes, in that vicinity, served upon appellees written notice, dated September 21, 1940, protesting the establishment of the funeral home at this place, saying it was an exclusive residential section, and that the operation of such business would cause them much personal distress and property damage, and that if appellees persisted in their intention the objectors would resort to legal means to prevent it and protect themselves and their property. This, it appears, was after the actual purchase of the property by appellees but before any expenditures had been incurred in making changes and alterations in the property needed to make it suitable for use as a funeral home. However, appellees say it was after they had contracted to have the changes made. The date of that contract, the extent and manner and cost of the changes are not shown in the evidence. Appellees gave no heed to the notice, whereupon this bill was filed by fourteen

such residents and property owners. By agreement, three dates were set for hearing the motion for a temporary injunction, but, for various reasons, the hearing was not had. The cause was heard on its merits December 6, 1940. In the meantime, appellees had continued with their remodeling of the building, and when the cause was heard had been operating the funeral home about thirty days. Final decree was rendered June 20, 1941.

The question for decision is whether the locality in which this funeral home is located is of such residential character as that the property owners and residents thereof have the right to enjoin its operation therein.

No map or plat of the area, or measurements, appear in the record, and it is difficult to be sure of accuracy by piecing together the oral testimony of the witnesses. However, this appears to be the background and the picture: Main Street runs generally north and south through Hattiesburg, and is the main highway entering it from the north. All other streets hereinafter mentioned run east and west and all cross Main at right angles, except that 6th Street approaching Main from the east, and Columbia Street approaching it from the west, intersect but do not cross Main. The east and west streets are named by numbers except Columbia, the numbers increasing from the business section north. Some three blocks south of the intersection of Main and 7th Streets (the funeral home being located one house removed from the southwest corner of that intersection), a railroad crosses Main Street. Near this point 4th Street also crosses Main. South of this is the business section. At the railroad crossing there are several commercial properties. The city blocks are some 450 feet long north and south—some perhaps longer. Therefore, the railroad crossing is about one thousand or more feet south of the funeral home. From this crossing north on the east side and facing Main Street, a distance of approximately half

a mile, there are only private residences, except a church, which is some two blocks south of the funeral home, and an ice plant and a gasoline station, which are opposite the funeral home. From the railroad crossing north on the west side of and facing Main Street, there are residences, and only residences, for approximately three-quarters of a mile, except the funeral home. The residences on either side of Main Street appear to be about as closely located to each other as is usually the case in residential sections in municipalities of this size in Mississippi. West from the funeral home, along the east and west streets, a distance of several hundred feet, there are residences, and only residences, except that out some seven hundred feet on Columbia Street, which is between 5th and 7th Streets, a Mr. Hughes operates a small grocery store in connection with his residence, and about the same distance west on 5th Street is a city fire station. Going east from Main Street, along the east and west streets, are residences for a distance of one thousand to twelve hundred feet, and there are no commercial properties until the Gulf & Ship Island Railroad is reached; thence across that railroad east is an industrial section of the City. Summed up: Within a radius of approximately one thousand feet in all directions from the funeral home, there are about one hundred and forty or more residences, which area includes a Baptist Church, the ice plant, gas station, and Hughes Grocery Store. The gas station has been so located about seven years; the ice plant about three. The plant building is forty by sixty feet and twenty feet high, does both a retail and wholesale business, and an addition thereto was either in the course of construction, or contemplated, when this trial was had. The proof further shows that this part of Main Street is an old residential section of Hattiesburg, and that the immediate vicinity of the funeral home is perhaps the oldest residential part of the City; the homes are valuable and many of the leading citizens live in the area in question.

After the institution of this suit, Mr. Fairchild purchased and moved into the residence immediately adjoining the funeral home on the north, and, about a week before the trial, Mr. Richard purchased the one adjoining on the south.

The undertaking establishment is equipped to render proper service for this type of business. It has four vehicles, including hearse and ambulance; shrouds and other burial clothing, caskets and coffins, for sale; a chapel for services; canopy and lowering devices, grass, and all equipment needed for interment of bodies. It also conducts a burial insurance department, in connection with which people go to and from the home.

It is necessary to further say that appellees have a contract with the authorities at Camp Shelby, a large military camp of the United States, located some eight to ten miles south of Hattiesburg, to conduct all funerals and render such burial services as may be needed for any and all persons at that Camp in the military service of the United States. It is shown that many thousands of soldiers are camped there—the exact number not stated—and that the camp is likely to be there a number of years, necessitating the holding of many funeral services at this home. One such service had been held when the cause was tried.

The proof further shows property damage and personal emotions and distress to the neighboring residents from the operation of this establishment, the details of which we will not recite, except to say that on the occasion of the military funeral the disturbance and distress in the community were unusual. The soldier had met a tragic death; his young widow and fifteen-month-old child and many soldiers were present; the military band played the funeral songs; the streets were blocked of all traffic. The services were held near noon and the excitement and emotions were so great that a number of people could not partake of the noon meal.

The chancellor found that the vicinity in question had been an exclusive residential section and would now be such except for the location of the ice plant and gas station across the street from the funeral home.

We think the conclusion of the chancellor as to the effect of the existence of the ice plant and gas station was erroneous. From statements in the brief of appellees the wrong impression may have been deduced from the case of Davis v. Holmes, 189 Miss. 554, 198 So. 25. That case referred to seven blocks surrounding the funeral home, but it was not the intention of the court to describe a minimum area which must exist to be entitled to protection; it was simply describing the area involved in that case, as bearing upon whether the location of the funeral home was in an essentially residential section. To require that the area cover seven or eight blocks would include a large part of most, and entirely all of some, of the municipalities of this state in which funeral homes are located. A residential section might embrace a much less area. The question is comparative and relative. The extent of the territory is only one factor. The number, kind, value and locations of the structures therein, the uses to which the territory is adapted, and all the surrounding facts and circumstances are to be considered. No hard and fast rule can be laid down. Each case must depend upon its own facts. Thus viewing the scenes of this case, having all factors in mind, we do not think the location of an ice plant, a gas station, and a small grocery store operated in connection with the owner's home, situated as these are, within a radius of one thousand feet, with over a hundred residences therein, changes a former residential section to one not now essentially so. The transition, if such is taking place, has not reached the point where the residents are not entitled to protection. Davis v. Holmes, supra; Tureman v. Ketterlin, 304 Mo. 221, 263 S. W. 202, 204, 43 A. L. R. 1155.

Also ''An undertaking establishment stands on a different footing from that of the occasional corner grocery and oil filling station which have made their appearances there. The latter may offend the aesthetic sense of those living in their proximity; the former would destroy, in an essential respect, the comfort and repose of their homes.'' ''The constant going and coming of the hearse; . . . the not infrequent taking in and out of dead bodies; the occasional funeral with its mourners and funeral airs, held in the part of the house designed for a chapel; the unknown dead in the morgue, and the visits of relatives seeking to identify them; the thought of autopsies, of embalming; the dread, or horror, or thought, that the dead are or may be lying in the house next door, a morgue; the dread of communicable disease, not well founded, as we have seen, but nevertheless present in the mind of the normal layman—all of these are conducive to depression of the normal person; each of these is a constant reminder of mortality. These constant reminders, this depression of mind, deprive the home of that comfort and repose to which its owner is entitled.'' Tureman v. Ketterlin, supra. This court also gave a graphic description of the natural effect of such a situation upon the nearby residents in Williams v. Montgomery, 184 Miss. 547, 186 So. 302. As was said in Cunningham v. Miller, 178 Wis. 22, 189 N. W. 531, 534, 23 A. L. R. 739: ''We think it is equally clear that maintenance of an undertaking and embalming establishment in a residential section must inevitably operate to decrease substantially property values, destroy the comfort and happiness of people residing in the immediate vicinity, and is an unwarrantable invasion of the rights of others.'' The vicinity of the funeral home in this case was essentially a residential section and its establishment and operation constitute a nuisance. For collection of cases on this subject see annotations in 23 A. L. R., p. 745; 43 A. L. R. 1171; 87 A. L. R. 1061.

With the modern conveniences and facilities now afforded by municipalities there is no necessity for funeral homes to intrude themselves into essentially residential sections over the protest of the residents thereof, and the present trend of the courts is to recognize that fact. Williams v. Montgomery, supra.

Appellees are in no position to complain of loss of investment. They heeded not the notice given them nor delayed their preparations awaiting a judicial termination of the questions by the courts. There is no element of estoppel as against appellants. Nor are we dealing with a funeral home already established and in operation, unchallenged, for an appreciable length of time.

The permanent injunction should have been granted, and such order will be entered here.

Reversed and injunction issued.